UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI

| | | |
|---|---|---|
| **SANDRA K. SMITH** | : | **Case No. 1:11-cv-00140-TSB** |
| **3041 Bellflower Court** | : | |
| **Edgewood, KY 41017-3301,** | : | **Judge Timothy S. Black** |
| | : | |
| **Plaintiff** | : | **FIRST AMENDED COMPLAINT** |
| | : | |
| vs. | : | |
| | : | |
| **UNIVERSITY OF CINCINNATI** | : | |
| **2600 Clifton Avenue** | : | |
| **Cincinnati, OH 45221** | : | |
| | : | |
| **Defendant** | : | |

Comes now the Plaintiff, by and through counsel, and states as follows:

### JURISDICTION, VENUE, AND PARTIES

1. This action is brought to redress grievances protected by the United States Constitution, 42 U.S.C. § 2000e-2, and 42 U.S.C § 2000e-3.

2. This Court has jurisdiction of these matters under 28 U.S.C. §1331 and 28 U.S.C. §1343.

3. Venue is proper for this action under 28 U.S.C. §1391, because the actions comprising the substance of this complaint took place in this judicial district.

4. At all times relevant, Plaintiff Sandra K. Smith ("Smith") was a resident and citizen of the Commonwealth of Kentucky.

5. At all times relevant, the University of Cincinnati ("UC") is an agency of, and organized and existing under the laws of the State of Ohio.

6. Greg Williams ("Williams") at all times relevant was an employee of Defendant

1

UC, and supervisor of Plaintiff.

7. Fred Reynolds ("Reynolds") at all times relevant was an employee of Defendant UC.

8. Plaintiff is before this Court pursuant to having filed a charge with the Equal Employment Opportunity Commission on September 30, 2010, and receiving a Right to Sue notice on January 7, 2011.

## FACTUAL BACKGROUND

9. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs above as if fully re-written here, and further states:

10. Smith was the Executive Director to three UC Presidents for seven years.

11. The three UC Presidents were: Nancy Zimpher, Interim President Monica Rimai and Greg Williams.

12. On November 1, 2009, Williams joined Defendant UC as new President.

13. On January, 2010, Smith was promoted to Executive Director.

14. President Williams approved Smith's promotion.

15. On January 13, 2010, Smith met with Reynolds regarding his transition to Defendant UC.

16. Smith discussed the UC Vice Presidents and their history, the history of the President's office, general UC history, former Presidents Nancy Zimpher and Monica Rimai and the atmosphere of the office.

17. Smith was very honest with Reynolds about the personalities of the VPs, President's staff and their past behaviors, history, etc.

18. Smith encouraged Reynolds to choose a title other than Chief of Staff due to the negative connotation that has been associated with this position when held by Kathryn St. Clair (under Zimpher).

19. On January 14, 2010, Smith received an e-mail from Reynolds.

20. The e-mail read "I already miss you and I'm not even there yet."

21. Smith was uncomfortable with this personal communication.

22. On February, 2010, Reynolds joined Defendant UC as Executive Vice President.

23. Smith was subject to excessive hugging from Reynolds.

24. Smith was very uncomfortable with this behavior but she didn't know how to tell him to stop.

25. Reynolds had a history of this type of inappropriate behavior and Williams was aware of this when he hired him and placed him in this position at Defendant UC.

26. On March 18, 2010, Smith had planned surgery for three herniated disks and was scheduled off work for three weeks.

27. After returning from my neck surgery, Reynolds tried to hug her, but Smith refused using the neck brace she was wearing as an excuse.

28. Reynolds, at the front desk of Williams office, called the Dean of College of Nursing Andrea Lindell ("Lindell") his "girlfriend" in front of Williams, Smith and students.

29. Smith found the remark offensive.

30. Reynolds told Smith not to hire any more female students because Williams has a tendency to flirt with the females.

31. Reynolds told Smith the only reason she was still with Williams' office was

because of him.

32. Smith heard Williams on more than one occasion say "obviously there's been some inappropriate conversations going on."

33. Reynolds noticed a coat rack in Smith's office and said "nice rack Sandy".

34. Reynolds laughed and pretended he didn't realize what he had said.

35. Reynolds purchased bed linens for a donor Diane Dunkelman ("Dunkelman") following a dinner at her residence, and said to Smith, "we'll be the last thing she thinks about before going to bed every night."

36. While at the coffee machine, Smith made a comment that she had a headache; Reynolds kissed her forehead (repeatedly).

37. Reynolds advised Smith to inform Williams about comments she had heard at a UC luncheon about Mrs. Williams having Alzheimer's disease.

38. Smith did inform Williams the following day

39. Reynolds later informed Williams that Smith held onto that information for quite some time.

40. Smith told Williams the day after the comments were made.

41. Reynold's statements were false.

42. Smith was loyal to Williams, she guarded the fact that his wife had Alzheimer's disease, and that he had kidney cancer.

43. Sandy also knew that he did not like meetings before ten and that he wanted off on Wednesdays.

44. A student worker informed Smith that Reynolds discussed her job status during

4

lunch with other employees in William's office.

45. Reynolds told those employee that Smith was threatened by Reynold's position.

46. The student told Smith that Reynolds said he was going to make Smith look like she was crazy.

47. Reynolds told the student that he did not know what was going to happen with Smith, but that she said she couldn't work with him.

48. One male student was told he would not be hired because he appeared more loyal to Smith than Reynolds.

49. The student worker was informed that he may not be offered a full-time position (as promised months prior).

50. Reynolds accused Smith of not turning in any "time of off work" forms for previous vacation and sick time taken.

51. Martine Hodges ("Hodges"), from Administration and Finance says she never received any forms.

52. Smith did complete the forms, and she had Reynolds sign off on them and Smith placed them in Hodges' in-box in her office.

53. Smith recreated the forms, had Williams sign them and personally handed them to Hodges.

54. After Smith had returned from her herniated disk surgery, her job responsibilities had changed and were diminished; Smith was not informed that any of her responsibilities had changed.

55. Cheryl McDonald ("McDonald"), Sr. Associate to Williams, no longer reported to

Smith.

56. McDonald had meetings with Reynolds about the student workers schedules, etc. but never invited Smith to attend and didn't inform Smith of the students' schedules.

57. McDonald came and went without informing Smith and she no longer discussed anything involving matters at William's office with Smith.

58. The atmosphere of the office became very cold, and unfriendly to Smith (including the student workers).

59. The Vice Presidents and others went directly to Reynolds for all matters including scheduling

60. Smith was no longer involved in the management of the office, Reynolds and McDonald were managing the office.

61. Williams was not rude to Smith but not friendly either, he had developed a cold and distant attitude toward Smith.

62. May 25, 2010, Williams told Smith that he heard from outside sources that she appeared to be much more loyal to Nancy Zimpher ("Zimpher") than to Williams now.

63. Williams said he had received complaints from outside sources about Smith, but provided no examples of any complaints.

64. Smith informed Williams of Reynold's comments to her.

65. Smith informed Williams that Reynold's comments made her very uncomfortable.

66. Williams did not comment on whether he is going to speak to Reynolds about the comments to Smith or not.

67. Smith suggested to Williams that she should move on to another position at

6

Defendant UC.

68. Smith suggested she could move into the UC Health Assistant to the CEO position.

69. Williams said to Smith that he was not going to beg her to stay.

70. Williams did not offer to assist Smith in transitioning out of the William's office to a new position (UC Health or otherwise).

71. June 14, 2010, Reynolds and Smith met (at Reynold's request).

72. At the June 14th meeting Reynolds told Smith that Williams had asked Reynolds to stay away from Smith for a few weeks because she's so angry.

73. Smith informed Reynolds that she was not angry, but uncomfortable with the inappropriate comments and behavior he made to Smith and others in front of her.

74. Reynolds denied he made any inappropriate comments or behaved inappropriately to Smith or in front of Smith.

75. Reynolds then told Smith that she was imagining all of these incidents because she had a "distorted mind" since her surgery because of the medication she had been taking before and after her surgery.

76. Smith informed Reynolds that she was sane before the surgery and completely sane following the surgery.

77. Smith informed Reynolds that she planned to move on to another position and would begin seeking new employment.

78. On July 22, 2010, Williams performed Smith's annual evaluation and it was very negative.

7

79. Williams requested that Smith work with Human Resources ("HR") on a performance enhancement plan to improve her work.

80. Williams also suggested that HR meet with Reynolds and Smith together.

81. Smith mentioned it would be very embarrassing to attend the HR Performance Enhancement Program.

82. Smith had more then 30 years of experience, more then half of those years in the HR area.

83. Smith agreed to the meeting with HR and Reynolds.

84. Williams indicated that he was highly offended that Smith wrote in her self-evaluation the term "likes and dislikes".

85. Smith's self-evaluation stated that she worked with City College of New York (Williams' former employer) to learn the Williams' likes and dislikes creating a smooth transition and avoiding disruptions to him upon his arrival.

86. Williams felt that this term was a perfect example of Smith's lack of communication skills.

87. Williams stated he felt the term "likes and dislikes" was a criticism toward him.

88. July 23, 2010 – August 2, 2010, Smith went on a planned vacation.

89. On August 3, 2010, Smith returned from vacation and requested a meeting with Williams as soon as he arrived at the office.

90. Smith explained that she had never had an evaluation like that in the past and it was difficult to hear.

91. Smith offered to leave that day if she could use her remaining sick and vacation

time or move to another department if that is what the Williams wanted her to do with her employment.

92. Williams rudely and loudly said he asked Karen Faaborg, HR Vice President, ("Faaborg") to investigate this situation (including comments made by Reynolds) so Plaintiff could wait to hear from her.

93. On August 4, 2010, 2:00 p.m. Smith was called into the Williams' office.

94. Faaborg was in Williams' office and informed Smith that she was being "terminated without cause".

95. Faaborg asked Smith for her keys to the office and UC purchasing cards.

96. Smith turned the keys and cards over and then asked if the reason for the termination is because of the "outside comments" the Williams informed her about on May 25, 2010.

97. Williams yelled, "no, it's because you refused to participate in the HR performance enhancement plan.

98. Smith was not contacted by HR or given an opportunity to begin a performance enhancement plan.

99. Smith was terminated on August 4, 2010.

100. Smith was given six months notice, based on the length of her service to Defendant UC.

101. The notice period began on August 4, 2010 and did end on February 3, 2011.

102. During this period Smith was not to report to work.

103. Smith filed a charge against Defendant UC with the Equal Employment

9

Opportunity Commission on September 30, 2010.

104. Smith charged Defendant UC with wrongful termination based on sexual harassment and retaliation in the workplace, a violation of the Civil Rights Act of 1964 ("Title VII")

105. Smith was issued a right to sue letter on January 7, 2011.

### COUNT I - SEXUAL HARASSMENT AND A HOSTILE WORK ENVIRONMENT

105. Plaintiff incorporates by reference each and every allegation contained in the paragraphs above as if fully re-written here.

106. Plaintiff is female.

107. Plaintiff belongs to the statutorily protected group of persons, due to her gender.

108. Plaintiff was subject to unwanted sexually explicit remarks and other verbal or physical conduct of a sexual nature by her co-worker Reynolds.

109. Reynolds' harassment was based on sex.

110. Management, Human Resources, Williams were aware of the harassment by Reynolds, yet took no actions to protect Smith from this behavior.

111. The harassment was severe enough to affect the terms and conditions of Plaintiff's employment.

112. Defendant UC has attempted to stain her good name.

113. Smith made $95,000 a year. She can't find a job, she is blackballed after years of exemplary service to the Defendant UC.

114. The actions of Smith's co-worker, Reynolds violated her rights and created a hostile work environment that was continuing, pervasive and severe.

115. The actions of her co-worker caused embarrassment, humiliation and physical harm, as well as lost wages and benefits to the Plaintiff.

## COUNT II - RETALIATION

125. Plaintiff incorporates by reference each and every allegation contained in the paragraph above as if fully re-written here.

126. Plaintiff was subject to unwanted sexually explicit remarks and other verbal or physical conduct of a sexual nature by her co-worker Reynolds.

127. Plaintiff opposed Reynolds conduct by reporting it to Defendant UC.

128. Plaintiff was terminated on August 4, 2010 by Williams.

129. Plaintiff's termination was retaliation by Defendant UC for Plaintiff's opposition to Reynolds' behavior.

130. As a direct and proximate result of Defendants' action, Plaintiff sustained harm.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff respectfully requests that the Court grant the following:

A) A judgment for compensatory damages for Plaintiff's economic injuries;

B) A judgment for compensatory damages for Plaintiff's non-economic injuries, including emotional pain and suffering and lost opportunity, in an amount to be determined at trial;

C) A judgment award of punitive damages in an amount to be determined at trial;

D) A judgment award for Plaintiff's reasonable fees and costs;

E) Trial by jury; and

F) Any such other relief in law and equity the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a jury trial on all issues triable to a jury in this matter.

/s/ Eric C. Deters

Eric C. Deters (81812)
    Email: eric@ericdeters.com
Charles T. Lester, Jr. (0017601)
    Email: cteljr@yahoo.com
        clester@ericdeters.com
ERIC C. DETERS & ASSOCIATES PSC
5247 Madison Pike
Independence, KY 41051
Phone: (859) 363-1900
Fax:    (859) 363-1900
eric@ericdeters.com
*Attorneys for Plaintiff*

CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was served upon the persons named below by the Court's ECF system on June 20, 2011.

/s/ Eric C. Deters

cc:
Rosemary Doreen Canton Canton@taftlaw.com, docket@taftlaw.com, marshall@taftlaw.com